at all. Mr. Keisler. Mr. Chief Justice, and may it please the Court, this is a case in which the courts are being asked to perform a legislative and regulatory function in a matter in which the necessary balancing of contending policy interests is among the most complex, multifaceted, and consequential of any policy issue now before the country. The courts must assess liability and design a new common law remedy for contributing to climate change, and to do so by applying a general standard of reasonableness to determine for each defendant, in this case and in future cases, what, if any, its share of global reductions in greenhouse gas emissions ought to be. That would require the courts not to interpret and enforce the policy choices placed into law by the other branches, but to make those policy choices themselves. And all of our arguments here, that plainness lacks standing, that the federal common law shouldn't be expanded to include this new cause of action, and that the case presents non-justiciable political questions, all of them represent distinct points. All of them flow from the same basic separation of powers principles that establish, we believe, that the case ought to be dismissed. All of these issues— I think that's exactly one thing that's concerned me. They do all flow from the same basic argument. And I'm concerned why you think we should focus on prudential standing, basically, which cuts off our jurisdiction at our own whim, as opposed to dealing with this on the merits. In either case, your argument is that this is too generalized for the court to address. Mr. Chief Justice, our principle argument has not been prudential standing. The government has focused on the prudential standing argument. We join that, and we'd be happy to see the case resolved on that basis. But our principle argument on standing has been Article III standing. And we actually believe that the Court could resolve this case and address the issues in any order, with one possible exception, which is that we do read the Court's decision in Steele Co. as holding that the Court has to address Article III standing before reaching the question of whether there's a valid cause of action. Mr. Keiser, what good does it do you to have this Court say there is no Article III standing? The suit will just be brought in State court, under State common law, and the State's rules of standing are not ours. Well, many States, your Honor, have similar doctrines of standing, similar doctrines of lifting questions. We only need one. Well, in any event, your Honor, we believe we would have a very strong motion to dismiss in State court on a variety of grounds, including— Well, we're not sure about that, are we? So we may be just spinning our wheels here. Well, indeed, you know, tapping the case to State judges instead of Federal judges. I'd frankly rather have Federal judges do it, probably. Well, as I said, your Honor, I think we would be able to defeat a State common law claim on grounds of State law, for lack of proximate cause, on standing before the question grounds that many States have that parallel these. But in any case, whichever ground the Court resolves this case on, we think it's clear that the cause of action can't proceed. Well, the Court— But if you had a State court suit with a State plaintiff, wouldn't the State be able to adduce Federal common law as a ground for recovery? And then we'd get to the merits and see if there's a Federal common law cause of action. It's possible, your Honor, although we think they'd be more likely to proceed under State common law. But either way, we don't think the elements of a State or Federal common law cause of action under nuisance could be met here. And we're very confident we could defeat that claim in State court as well. Well, we all know that you'd sometimes have to peek at the merits to see if they're standing. There's a little cheating that goes on. But in this case, it does seem to me that you're lacking any clear precedent. When I think of standing, I think of Frotheringham v. Mellon. That isn't this case. But the Court has said in Warth v. Selden that the plaintiff has to demonstrate that it will benefit in some tangible way from the Court's intervention. If you have the precedent, Massachusetts v. EPA, and if any one plaintiff has standing, I guess that's enough. So if we look at standing alone, it seems to me that the States would have standing on the same basis that Massachusetts had standing. Justice Ginsburg, we believe that Massachusetts was very carefully qualified to focus on the particular regulatory context of that opinion. The Court said that it was addressing standing to challenge the denial of a petition for rulemaking when the agency would be proceeding incrementally to address a broader problem, and a statute specifically gave the petitioners the right to seek that kind of incremental protection. The Court was very specific about that. The statutory right was of critical importance, it said, to the standing of the Supreme Court. Ms. Gosar, the Court did say that, but it's cut off from the Court's actual analysis in the case. When the Court goes through injury and causation and redressability, the Court never refers to the statutory clause of action. But it does, Justice Kagan, specifically refer to the regulatory context in which the case is taking place. The Court said that if the EPA's arguments there about traceability and redressability were adopted, it would doom most challenges to agency action because agencies proceed incrementally. Here we have no statute, we have no agency proceeding incrementally, and we believe there is no basis for the plaintiffs to seek that kind of incremental relief when they've acknowledged they will have no material effect on their injuries. And they acknowledged that in the State's complaint, when they specifically said that the relief they seek here would only constitute these defendants' share of the larger overall emissions reductions that would be necessary in order to have any material effect on climate change or the injuries that they assert, that is an acknowledgment that the relief they seek here would not provide them any redress except in connection with other reductions that would be obtained elsewhere. And that, we think, means that this is a classic case in which the injuries are not the product of the defendant's conduct but of the collective independent actions of numerous third parties not before the Court. But the Court clearly understood that in Massachusetts v. EPA and said that it was And I would think that under traditional standing principles, the standing there was actually harder to find because one had to go through the EPA first. One had to say the EPA should regulate, and then the EPA would regulate, and then the question was would that reduce emissions levels. Here the EPA is out of the picture. The action is much more direct. But there, Your Honor, they were suing a defendant at the EPA that had regulatory authority over the entire country. Here they are suing five separate defendants, each of whom have to be evaluated individually, and there is not a single one of them against whom the relief sought would have any tangible effect on the injuries that the plaintiffs claim here. But we also think that Massachusetts is relevant in a completely different respect, which is the Court was very specific in Massachusetts about what its role was and what it wasn't. The Court said we lack the expertise or the authority to second-guess the policy choices of the EPA, that its role there was to compel the agency to adhere to the statute as the Court interpreted. In this case, the States are asking the courts to play exactly the role that this Court has claimed in Massachusetts v. EPA, which is to make those policy choices in the first instance. And they say that the courts can do this because the courts have done this in prior nuisance cases. But this case is nothing like any of the prior nuisance cases this Court has held. It's nothing like an instance in which one State is complaining that another State has dumped sewage into a body of water that's crossed the border. The case — So how many States does it take? I think, you know, if it's three States who've made that allegation, I don't know exactly how you draw the line between a case like Tennessee Copper and this case. It's not a question of the quantity of plaintiffs, Mr. Chief Justice. It's the nature of the have to perform. And this task is different because of the global nature of the phenomenon. I would — I'm more receptive to this kind of argument if I know we're going to the merits as opposed to standing. And I recognize that we slip in and out of the two categories and don't want to make it difficult on you. But I take it that these arguments also go to whether there's a cause of action on the merits. Exactly, Your Honor, and whether the Court should expand the federal common law to recognize The global nature of this phenomenon makes it different because every sector of the economy worldwide produces greenhouse gases, and there is no geographic nexus, as there was in Tennessee Copper and every one of the other nuisance cases, between the source of the emission and the victim that claims the harm. And that changes what the Court has to do. It means that any court or policymaker thinking about how to alleviate the kinds of injuries that are pled here has to first think, what is the appropriate overall level of greenhouse gas emissions in the atmosphere, and then make a comparative judgment about how the reductions that would be necessary to achieve that level should be allocated among all the different sectors based on the social good that that sector produces and what reductions would mean. I thought your first argument when you addressed this issue was there is a decision-maker, and that decision-maker is EPA. So you wouldn't get to even how arduous a task this would be if it was within the Court's barrel. I thought your position was that the function, this regulatory function, had been assigned to the EPA and not to the Court. We are making both arguments, Justice Ginsburg. We don't think there would be an appropriate federal common law cause of action even if the Clean Air Act hadn't been enacted. But certainly the argument is even stronger and easier because of the existence of the Clean Air Act, and in particular because this Court in Massachusetts v. EPA interpreted the Clean Air Act so that the term pollutant specifically includes greenhouse gases. And that means that Congress has assigned to EPA the task of making precisely the determinations that plaintiffs ask the courts to make here. Do greenhouse gases endanger the public? And if so, what regulatory consequences? Well, the EPA is given authority to regulate other pollutants, including those that don't go up into the atmosphere. But that does not prevent California, for example, from enacting stricter standards for automobiles in its state. So why should we say that the EPA preempts the federal common law? Because this issue, and I would prefer to refer to it as displacement rather than preemption, is very different from the question of preemption of State law. The Clean Air Act has savings clause that preserves State authority across a variety of areas. But the Court in the second Milwaukee v. Illinois case specifically distinguished between preemption of State law and displacement of federal common law. It said the presumption is against preemption of State law because of various concepts of State sovereignty. But because of Federal concepts of separation of powers, the presumption is in favor of lawmaking by Congress and not lawmaking by courts. And that means that the standard is very different. It means that if Congress has addressed the problem, then federal common law is displaced. What's your best case? Milwaukee v. Illinois 2. That was the case in which the Court held that the Clean Water Act displaced a federal common law nuisance claim by Illinois against Milwaukee, and specifically said because Congress had addressed the problem, federal common law had no role to play. Here Congress has established a process, and it's a process in which the States and the private parties here can participate. They can file petitions for rulemaking. They can appeal EPA decisions that they oppose. And it would be completely inconsistent with that process if they could also take a complete end run around it and go to court and ask courts to make the decisions that Congress has assigned them. This is a meritorious case, right? Yes, it is a meritorious argument, because it says that any federal common law action would be displaced by the Clean Air Act. Now, the — Is the consequence of that argument, Mr. Keisler, that there, in fact, is no federal common law of interstate pollution claims? I don't think there is very much left of any federal common law of interstate pollution claims, just because the field has been so heavily occupied by statutes. You know, all the nuisance cases that the Court of Appeals relied on, Your Honor, they were in a completely different time. They were at a time when the Court's view of its common law authority was extremely broad, and its view of Congress's constitutional power under the Commerce Clause was very narrow. Of course, you're going to have to struggle with the preemption question sooner or later. You're confident you can establish not only displacement of federal common law, but also preemption of state common law, right? It will ultimately depend on the state of the law at the time that such a hypothetical case is filed, but we would welcome the opportunity, Your Honor. Is part of the inquiry, part of the dynamic, how imminent the federal regulation is? I don't think so, Justice Kennedy. I think the question is always what Congress has done, not what the stage of the EPA rulemaking process is. Congress, not EPA, can create or modify or destroy causes of action. And that's why the Court said in that Milwaukee 2 case that when Congress has addressed the problem, that's the end of the inquiry. And there's no question that Congress has addressed not simply the general problem, but the specific problem here. It has a statute which assigns EPA the authority to regulate pollutants in certain ways, and pollutants have been defined under Massachusetts v. EPA to include the precise greenhouse gases that are at issue here. There couldn't be a more specific example of Congress having addressed the problem and assigned a different approach to dealing with it than letting the courts work it out under federal common law. And the State's and the private plaintiff's argument is that the federal common law will only be displaced when EPA adopts the precise regulation that provides the precise form of relief that they're asking for. And there's no case that says that, and that's not the law. If you couldn't give — could EPA give that relief, we're dealing with existing stationary sources and not dealing with new or modified sources. We believe that the EPA can consider, as it's undertaken to do, regulating existing non-modified sources under Section 111 of the Clean Air Act. And that's the process that's engaged in now. It's announced that it will propose standards in the summer and complete a rulemaking by May. Obviously, at the close of that process, there could be EPA challenges on a variety of grounds, but we do believe that they have the authority to consider standards under Section 111. And if the Court has no questions, with the Court's permission, I'd like to reserve the balance of my time. Thank you, Mr. Keisler. General Katyal. Thank you, Mr. Chief Justice, and may it please the Court. In the 222 years that this Court has been sitting, it has never heard a case with so many potential perpetrators and so many potential victims. And that quantitative difference with the past is eclipsed only by the qualitative differences presented today. Accordingly, the Court should apply the prudential standing doctrine and hold these lawsuits not fit for judicial resolution. The very name of the alleged nuisance, global warming, itself tells you much of what you need to know. There are billions of emitters of greenhouse gases on the planet and billions of potential victims as well. Well, again, that just goes to the merits. If you make that argument to the district court, your injunction is meaningless. Equity does not require an idle act. End of case. Well, Justice Kennedy, I think it goes to both. That is, this Court, in outlining what the prudential standing doctrine is all about, and, for example, Newdow has said the following at page 11, without prudential standing limitations, the Court would be called upon to decide abstract questions of wide public significance, even though other governmental institutions may be more competent to address the questions, and even though judicial intervention may be unnecessary to protect individual rights. I'll add a third thing that it goes to, and that's Article III standing. I mean, it's clear in our cases if, as you say, the relief requested here will not remedy the complaint of these people, you don't have to go to prudential standing. That, it seems to me, would deny Article III standing. Well, Justice Scalia, I think that this case is best like Newdow, in which the Court went to prudential standing first before Article III, and the reason for that is because this Court, in Massachusetts v. EPA, in analyzing the redressability prong of what you're asking, said that the reductions that were sought there, if granted, would, quote, slow or reduce the problem. Well, I'll think about it, but Newdow was a case where we thought that this particular litigant was not directly injured. Here, the State says it's directly injured. That's the distinction. Well, more than that, Newdow was a case of a father trying to assert a right on behalf of a child, and the child herself did not want that right, nor did her mother. So it seems to me it's worlds apart. And when you describe prudential standing as involving generalized grievance, I thought that the generalized grievance was Article III. I thought that's what Mrs. Frothingham's case was about. It was a grievance that she shared with everybody in the population, so she didn't have standing. Justice Ginsburg, we're not here saying that this case falls inexorably from the facts of Newdow or, frankly, from any case that this Court has decided. There is no case in the 222 years that announces the precise rule we're seeking here, and the reason is because you have never heard a case like this before involving the quantity and quality of the claims sought here, the skull of the prosecutor. But it seems, General Cardio, that there also is no case where we've ever used this language of generalized grievance as a prudential matter rather than as an Article III matter. So am I wrong about that? Well, I think that this Court has, in Newdow and in Worth v. Selden, used the language of generalized grievances to reflect prudential consideration. Newdow quoted the language of generalized grievance that came from Worth, but it didn't specifically pin anything on that language. I quite agree with you, Justice Kagan. This is not like a case in which the government is announcing some rule of standing that requires the Court to, for example, call into question previous precedents of this Court that reached the merits or something like that. This Court has never had a case involving this scale and scope. And we think that the prudential standing doctrine, at least in a circumstance like this, which is a Federal common law cause of action in which the Court is already being asked to fashion the rules, and as Justice Scalia says, an equitable action in which the Court has, I think, special abilities to fashion relief if appropriate and not, I think prudential standing reflects best the kind of tapestry of the practice. Well, General Cardio, how about the Aitken case? Because in the Aitken case, I think the government came in and made the same argument, that even though the injury was concrete, it was too generalized, and therefore there should be no standing. And the Court specifically rejected that argument, both as to Article III and as to prudential standing. Right. And I think Aitken says that the prudential standing cases thus far have been about has concrete injury been shown to a particular person. And we're not disputing that for purposes of Article III, concrete injury has been shown to at least one plaintiff. To that extent, you disagree with Mr. Keisler because he says there's no Article III. That is absolutely correct. We do disagree to that extent. We think that prudential standing best reflects the Court's general intuition in this area, that when a problem is of this magnitude and literally involving the world, where everyone is a potential perpetrator, everyone is a potential victim, and where their own theory at page 15 of the Court of Appeals is that they can be sued, they can be stopped, to the nuisance, they can be sued. Now, we don't usually, your phrase is exactly what bothers me, we don't usually base a decision on our general intuition. And the idea of prudential standing, that we have jurisdiction of a case, but we're not going to decide it, is contrary to Chief Justice Marshall's famous line, that if we don't have jurisdiction, we can't decide it, but if we do, we have to decide it. But I think that the prudential standing doctrine generally, and the zone of interest test in particular, really do focus on this question, Mr. Chief Justice, about whether or not a case can be cut down to judicially manageable standards. I'll give you that on the zone of interest, but there you're dealing with administrative law and a very narrow proposition. I think it's Justice Kennedy's point, or at least point of his questions, that these issues meld into the merits, and at least for anyone who's troubled by the idea that we're not going to decide a case even though we have jurisdiction to decide it, maybe that's the better place to address it. Well, I'll move to that and take your invitation, Mr. Chief Justice, before doing so. I would say that if you're going to give me administrative law and zone of interest, I think you should then give me Federal common law, which this Court is at its height in terms of fashioning who can come into court and what those rules should be. I don't understand why you assert that the remedy here will not provide the relief. You acknowledge that, don't you? That the remedy here cannot possibly stop global warming, right? We acknowledge that the relief that they are seeking looks like the relief in Massachusetts v. EPA, which is that it would if the Court— It does. It does. In Massachusetts v. EPA, the relief was allowing a Federal agency to regulate the entire society's carbon emissions. Justice Scalia, that isn't what the Court said. What the Court said is that it would allow regulation in the transportation sector, which would be approximately 1.7 billion tons, and here they are saying 650 million tons. And so I agree it's less, but I think that one can criticize the reasoning in the majority, but that is the rule of this Court, and I think that as long as a slowing or reduction— You think that was the holding of Massachusetts v. EPA, that EPA can only regulate the transportation section? That is what the Court based its redressability analysis on. Is that the holding of the case? And do you think the forthcoming EPA rules can only govern transportation? Of course not. I'm just saying that— Of course not. Of course the case covers what the EPA can do. Right. And I'm just talking about the redressability part of the analysis, Justice Scalia, and for that, the Court said that this reduction in the transportation sector was sufficient. If I could take the Chief Justice's invitation to address displacement at this time. We believe that we meet the State's own test for displacement, which is found at page 46 of their brief, which is a Federal common law nuisance claim is displaced when a Federal statute or regulatory action addresses the nuisance. And here you have not just the Clean Air Act, you have the Clean Air Act plus, a cascade of a number of different actions taken after Justice Scalia, the opinion in Massachusetts v. EPA. At what point in this cascade did the displacement occur? We think that the Court doesn't really need to get into it, and the reason is this. Displacement actions are extremely rare. Federal common law actions are rare. So we don't think you should announce some sort of general standard for when displacement occurs. It's a more case-by-case situation. Here you have undoubted evidence that it occurred, that it has occurred because of a number of different things. But we don't know what EPA may do down the road. We don't know what Congress may do down the road. So don't we have to have some idea about when this takes place in order so that this precedence may be applied to the future course of Congress? Certainly, Justice Alito, I think it's appropriate for the Court to look at what is happening right now, and here's what's happening. First, in December 2009, the EPA issued an endangerment finding, finding these greenhouse gases significant pollutants. General Katyal, suppose that the EPA had decided not to issue the endangerment finding. Would your argument still apply? I think that that would present a difficult case because it would be the one like the Petitioners make, which is the Clean Air Act alone. And I think that what the language of Milwaukee 2 says — excuse me, Milwaukee 1 says in it is that — and this is at page 107 of the opinion — it may happen that new Federal laws and new Federal regulations may in time preempt the Federal common law of nuisance. We think that both together presents the best and easiest case for displacement. And you have that here. You have not just the endangerment finding. You have the EPA regulating all passenger cars, all light motor vehicles, for example. You answered a hypothetical I gave you. What would the answer be? No endangerment finding. Is there displacement? I think that it's a difficult case to make for displacement, but I think it could be made for the reasons Mr. Keisler suggests. Why is it — I don't want to make — try to make a case for you, but why is it that much more difficult? It's just — I mean, it's sort of like the negative commerce clause, right? The fact that EPA has the authority to regulate in a particular area means that the ball has passed from the courts to the agency, to the executive branch, and they've made an implicit decision not to regulate a particular question. Absolutely. I think that there's a good argument to be made. I imagine the argument on the other side that you'll hear in a moment is that the Clean Air Act doesn't look precisely like the Clean Water Act in terms of forcing the agency to decide various things. I guess that would be a preemption question rather than a displacement question. I think that very well may be. And with respect to that, Mr. Chief Justice, you had asked before about State common law causes of action and whether they would be — they would kind of — the existence of those would somehow mean that the Court should either find jurisdiction or reach the merits in a way. And we think that the same arguments that prohibit the Court from recognizing a Federal common law cause of action for displacement very well may be preemption questions as well that could be addressed down the road with respect to State common law actions. And we don't think the Court should be troubled by the existence of a potential State common law cause of action. It's just like Milwaukee, too, in which the dissenters made precisely this argument. They said, if you don't recognize it, then the States will regulate it and it will balkanize and the like. And what the majority said is, that's a question for down the road. The question for now is, has displacement occurred? I understand that that's not the issue here, but does the government have a position on that? If New York law provides exactly the same public nuisance claim that is now asserted under Federal common law, would that be consistent? I don't think we have a position at this time on that. That's, I think, an enormously complicated question we'd get into at an appropriate time. Our central — our central submission to you on displacement is this, that there is literally no precedent for the argument that they are making here, which is that the Federal government has to regulate the precise jot and tittle of the specific relief that they are seeking before displacement occurs. And do you have a position on whether there's anything to be displaced here? Do you have a position on whether there is, in fact, a Federal cause of action? Well, we think, again, the Court doesn't need to get into that question because, you know, the — there's few Federal common law causes of action in the area of nuisance. I mean, and there have been two that the Federal government has filed since 1970, and three that we can find altogether in the Federal courts of appeals, all of which has failed for various displacement reasons and the others. We think none of those look anything like the common law cause of action here. And so it would at least require this Court to extend, quite dramatically, Federal common law to cover this type of situation in which everyone is a potential perpetrator and everyone is a potential victim, and it would require the Court, in fashioning relief, to think through a number of things that the Federal courts haven't ever had to grapple with from the — So if there were no — if there were no Clean Air Act, you would still say that this suit — a suit like this would fail prudential standing, but you don't have a position as to whether there would be a claim under Federal common law? That is correct. We think it would still fail prudential standing because of the quantity and quality of the nature of the problem here and the multitude of different policy judgments that would be required — that this Court would be required to undertake to adjudicate a Federal common law cause of action in the absence of a statute. But I'm sorry, General, because I was understanding your answer differently, and maybe I misheard you, as saying that if there were no legislation here, you doubted that there was a Federal law cause of action. Is that correct? I doubted that there was prudential standing. No, but as to whether the cause of action exists under Federal common law in a case like this, where you said it was so different from the other Federal common law cases the Court has seen? I think I put it as we doubt it. I mean, I think that it would require a dramatic extension, Justice Kagan. The case like Tennessee Copper and the other cases that this Court has heard, which are essentially A pollutes a river or something and hurts B, A here is the world and B is the world. And that is such a difference in scale and scope to pose enormously difficult questions as to whether this Court should recognize such a cause of action. It's the same hypothetical. Assume no Federal statute and assume no Federal common law. What about State law? Does State common law become displaced because it's a matter of Federal concern? We don't usually have preemption of Federal common law. Well, there may be arguments, Justice Kennedy. I'm not sure if the premise of your question has a Clean Air Act in existence or not. There may be some sort of arguments about displacement or preemption under the Clean Air Act. Hypothetically, the Federal law doesn't. Federal statutory law doesn't. Then I think that, again, for the purposes of State common law, I think this Court would approach that question the same way it did in Milwaukee, too, which is to say that's a really separate policy-based question that the Court doesn't use to answer the questions about whether a cause of action should be recognized or whether displacement has occurred. But I would point out that the States that have sued generally have doctrines like prudential standing, doctrines like political question that may very well bar the reaching of these claims in State courts as well. It would be very odd to say that there's no Federal common law, but also that there's no displacement of State law. That seems to me odd. Well, that's precisely the situation that this Court was grappling with in Milwaukee, too. Can we get to the situation that now exists? They are seeking standards for existing sources. I asked Mr. Keiser, and do you agree with him, this is not a new source or a modified source, talking about existing sources. Does EPA, could EPA regulate and set standards for existing sources? Absolutely, Justice Ginsburg. Let me say three things about that. First is EPA is currently regulating existing sources to the extent that a power plant is modified in any way to increase carbon dioxide above a certain amount, and this is one of the so-called tailoring rules. Then those power plants right now are subject to regulation. Indeed, one has already had to get a permit. These regulations just went into effect in January 2011 for existing power plants that seek to modify. Second, there is a settlement agreement in place that commits EPA by May of 2012 to deciding how and whether to regulate existing power sources, the existing stationary sources. And third, and I think most fundamentally, there is no precedent, Justice Ginsburg, that says that the government must regulate the specific industry, the specific thing that the plaintiff isolates, in order for displacement to occur. Rather, sea clamors and Milwaukee 2, I think, make explicit that that's the wrong question. And so long as the nuisance is being addressed, and here the nuisance is undoubtedly being addressed with a panoply of different federal actions in the area of global warming and an executive order that says that fighting global warming is one of the government's highest priorities, and concrete steps taken, such as the 500-page tailoring rule, the 400-page, the other hundreds of pages that EPA has done with its experts to appropriately regulate greenhouse gas emissions, as opposed to a federal common law court of action doing something which would, frankly, put you all at sea in terms of the complexity, economics, international nature of the problem. General, could I take you back on that last point to another threshold question, which is the political question doctrine? Because a lot of your arguments really sound like prongs two and three from Baker v. Carr. But you say that we shouldn't go there, that we should instead address this matter on prudential standing grounds. But the political question doctrine actually seems more natural, given the kinds of arguments you're making. So why not? Well, Justice Kagan, I'm not going to tarry too long on which different way we should win this case. I think either is an appropriate way. But I think that the prudential standing doctrine is a bit narrow because it contemplates a variety of factors, including the fact that this is a federal common law cause of action where the Court is fashioning relief in the first place, as opposed to the political question doctrine, which looks more to the standardless nature of the adjudication. We agree that the political question doctrine is an appropriate way to dismiss this case. But we think that, like Newdow, like Kowalski, this Court can handle this case on prudential standing first and recognize that this is an unprecedented action involving literally the world, and it is not suited for judicial resolution. And that flows quite naturally from the precepts of the prudential standing doctrine. It's not an area where the Court can't go. The way, when I take a political question we all agree on, I think, the Courts can't mess with the impeachment of a president. This is off-limits totally. But here, if the Court does deal with the subject matter all the time, it reviews decisions that the EPA has made. Justice Ginsburg, we quite agree, and that is why we say that if a statute were announced to provide standards, that that would provide a way around the political question problem that exists in this case. Thank you, General. General Underwood. Mr. Chief Justice, and may it please the Court, this case rests on the longstanding fundamental authority of the states to protect their land, their natural resources, and their citizens from air pollution emitted in other states. It rests on three propositions. One, the interests of the states are harmed by global warming. Two, these defendants, as the five largest U.S. emitters of carbon dioxide, are significant contributors to it. And three, these defendants could take reasonable, cost-effective measures to reduce their emissions in a way that would slow the effects of global warming. We will have to prove these propositions. And after we do, the District Court will have to determine whether it can frame an appropriate equitable injunction. That's what discovery and trials are for. But this Court should not close the courthouse door to this case at the outset. The common law action for public nuisance has been around for hundreds of years, has been adapted by courts to cover new environmental threats, and there's no reason why the courts can't do the same thing here. The defendants say there are too many plaintiffs, too many potential defendants, and that adjudication of this case will require courts to solve the entire problem of global warming. But that is simply not so. On the plaintiff's side, this is about the states. We are alleging the kind of injury to states that has been traditionally recognized by this Court. Their lands, their citizens, their businesses are being injured by pollution emitted in other states. General Underwood, the relief that you're seeking, asking the Court to set standards for emissions, sounds like the kind of thing that EPA does. I mean, Congress set up the EPA to promulgate standards for emissions. And now the relief that you're seeking seems to me to set up a district judge who does not have the resources, the expertise, as a kind of super EPA. It's not as a super EPA. It's something much smaller. It's a different question. Interstate pollution disputes have historically been entrusted to the courts, including the determination of how much is unreasonable, which is... But if we just concentrate on, I think, the relief you want to say, district court, if we pass everything else, you set emission standards, you put a cap immediately, you set a cap, and then annually you require further reductions. Well, that just sounds to me like what EPA does when it sets emission standards. Well, it's also like what the Court did in Tennessee Copper. That is to say, this case doesn't ask the Court to decide how much, contrary to what Petitioner suggests, to decide how much emission reduction is required to solve the whole problem of global warming and then allocate a portion to these defendants. It asks the Court to do something simpler. And that is to decide whether these defendants can take reasonable, cost-effective measures that would help to slow the pace of global warming. How does the district judge decide what is reasonable and cost-effective? There are considerations. This is not a situation in which the emission of greenhouse gases can be totally prohibited. Correct. There are countervailing interests. So how does the Court, how can a district court balance those interests? Well, I'll say two things about that. One, it was also true in Tennessee Copper that it was not the case that the sulfur emissions could be eliminated or that the plant was to be put out of business. The Court in that case ordered a reduction of sulfur, a quite specific reduction of sulfur emissions in one season and more in another season. Would you seriously argue this isn't orders of magnitude more complicated than that case? It's somewhat more complicated. It's larger. I don't know if it's more complicated. The way a court would do that is presumably the way it did it in Tennessee Copper. That is, there could be expert testimony. There could also be evidence about what other emitters are doing, what they do that is feasible and cost-effective to reduce their emissions. In Tennessee Copper, one of the defendants settled and the other was subject to an order. And it would have been available to the Court to look to what the settling defendant did for some indication of what the non-settling defendant might well be ordered to do. So there is evidence available from which a court could conclude what is reasonable. What factors go into the cost-benefit analysis that would have to be undertaken to decide what level of emissions are reasonable in light of the threat of global warming? Available technology, the cost of that technology. Obviously the greatest benefit to reduce global warming would be, of course, to shut down the power plants, right? We haven't asked for that, and nobody suggests that that would be appropriate. It's not any more than it was in Tennessee Copper. But, I mean, across the economy, the whole problem of dealing with global warming is that there are costs and benefits on both sides, and you have to determine how much you want to readjust the world economy to address global warming. And I think that's a pretty big burden to impose on a district court judge. Well, it's also a burden that the plaintiffs would have to bear. That is to say, we have alleged and are entitled to try to prove, and we might fail, that would be for the district judge to determine, that the defendants have available to them practical, feasible, and I'm reading from the complaint, and economically viable options for reducing carbon dioxide emissions without significantly increasing the cost of electricity to their customers, including changing fuels, improving efficiency, and altering... Dealing with an electric grid that connects, I don't know how vast an area, but certainly a vast area here, and the fact that they can reduce their emissions in a way that doesn't affect their customers is based on the fact that other power plants that are part of the It may or may not be based on this. These are facts that can be proven or not proven at trial. But generally, they're usually facts that are determined by an administrative agency. I mean, even just reading that part of your complaint, it sounds like the paradigmatic thing that administrative agencies do rather than courts. But if there were no agency, and if there were no Clean Air Act, and somebody was shooting poison into the air in a way that injured people in another state, the states would have... But if there were no, and if there were no, we'd be living in a different world. There is an administrative agency, and there is a Clean Air Act. But those are questions about what has been called the merits or displacement. The question of Article III standing, the question of justiciability, the question of political question, those are the same questions, whether there's an agency or not. We can concede that, but we still have the displacement argument in front of us, and I thought that's what we were addressing. We can talk about the displacement argument. I just wanted to be sure that I understood the question of standards to be a question addressed to the political question point. And even if it might be desirable to have an agency set standards, it is not something that is beyond the power of a court to do. And the court set it back. The agency is engaged in that, in it right now, and that's another facet of this case, the potential for conflict. The EPA, after acting for a while, has now agreed that it does have authority to classify this as a pollutant, and it has taken the first steps. One argument that the EPA and that the United States is presenting is the way agencies go about this is incrementally, so they're starting with motor vehicles, and then maybe they'll go to new sources, and then they'll get to maybe where you are. But you want the court to start with the existing sources to set limits that may be in conflict with what an existing agency is doing. Do we ignore the fact that the EPA is there and that it is regulating in this area? No, we do not ignore that. This is a very peculiar moment in time for this case to arrive in this court, because what is offered as displacing is something that is said to be imminent, not something that actually exists. And something that is imminent may never happen. It was, of course, for that reason that I believe the United States suggested a GBR, and we suggested that the case be dismissed so that the lower courts could deal with the unfolding events as they occur. But the case is here now, and there is no federal statute or regulation that currently regulates the emission of greenhouse gases by existing unmodified power plants like the ones operated by the defendant. And the Clean Air Act works very differently from the Clean Water Act. It did not put in place a permit system for all emissions when it was enacted in 1970. Unlike the Clean Water Act two years later, which forbids all discharges until they're approved, the Clean Air Act doesn't regulate anything until the EPA makes findings and imposes restrictions. I suppose there were reasons that Congress adopted that approach, and your suit would override those determinations. No, our suit is consistent with those determinations. That is to say, the design of the statute leaves preexisting law in place until EPA steps in. If the Clean Air Act were thought to displace the common law before any regulation occurred, that would mean the immediate effect of this anti-pollution law in 1970 was to reduce pollution control. How much regulation do you need before you would admit that there is displacement? Is it a preemption analysis that you're adopting or a displacement analysis? A displacement analysis. I believe it's a displacement analysis. What we start from is that the states have a historic right to go to court under the federal common law and to deal with the problem of interstate pollution, and that that was a promise that they obtained that, that federal remedy, in exchange for the surrender of sovereignty in joining the Union. So there has to be — there's a strong federal interest in there being a federal remedy. Now, when the Clean Air Act was passed without any regulations, if it displaced the federal common law, there would be no federal law applicable at all, because the federal common law would be displaced and there would be no federal regulatory law. The states would have recourse at that point to state common law, as has been suggested. That would be available still. But this Court has said repeatedly, and it's correct, that there is a strong federal interest in regulating this subject matter of interstate pollution with federal law. Federal common law is the default position. And when Congress and the agency act to displace federal law and put in place — to displace federal common law and put in place federal regulatory law, that's when the displacement occurs. So when — What is your test for displacement? When do we tell whether there's displacement or not? Has there been some displacement in this case, but just not total displacement, or — There's been displacement. As to automobiles, the EPA made a considered judgment about emissions of carbon dioxide with respect to light motor vehicles. The EPA has made no judgment with respect to stationary sources. What if the EPA made a judgment, but it just was not the judgment that you liked? Suppose that the EPA said, we've looked at stationary sources. We're not going to regulate. Would that displace? I think if it were a judgment that the amount of carbon dioxide emission from stationary sources that was currently happening was the correct amount, that would displace. That sounds like preemption to me and not displacement, or at least preemption with another label. Well, of course, there are some similarities between the two. In each case, we're talking about whether one law substitutes for another, whether one law ousts another. Well, maybe you can tell me to what extent displacement is different from preemption. Tell me in this area you're going to have displacement, but not preemption. Or I guess it's the other way around, in which there's going to be preemption, but not — well, what's the difference? You said in response to Justice Kagan that if they've made a considered decision that this is the amount and no other amount, higher or lower, then there would be displacement. In what way is that different from preemption? Well, the difference isn't on that front. The difference is that with respect to preemption, Congress has to decide that it wishes to override State law expressly. Here, what we're talking about is simply whether Congress or the agency has acted. It's a little different. They don't have to have in mind Federal common law. They simply have to act in a way that overrides — that substitutes for Federal common law, because the promise of the Republic, really, for the States, was that the States would have a Federal law applicable to their interstate pollution dispute. And until there's a new one, they have the old one. I don't think that they have to have in mind State law for preemption, either. If, indeed, the State law just positively conflicts with a Federal statute, it doesn't matter whether Congress had State law in mind, does it? I don't know. No, but — perhaps not. But we talk about, though, whether there was intent to — that preemption is ultimately a matter of congressional intent, and whether Congress intended — and preemption should not be lightly inferred. It's probably the case that preemption should be harder to find in a closed case. You haven't told us how. It's certainly not harder to find, because for preemption, you require congressional intent, whereas here — whereas for displacement, you don't. That's not the — that's not the difference. What is the difference? Well, I think in this context, they probably work pretty similarly. I would just say that in each case, the question is, what is the — what does the new law do with respect to the law that it is said to replace? And — I think you're right that under your theory, they operate pretty similarly. And I thought the whole point of Milwaukee v. Illinois was that they're two very distinct propositions. Well, they have different reasons for existing. That's certainly what Milwaukee v. Illinois said. That doesn't mean they have to, in every instance, operate differently. The point of preemption is about the Federal-State balance, and displacement is simply — is about separation of powers and the interaction of various agencies within the Federal Government. Your point is that EPA — unless — until EPA gets to the point of setting standards for existing sources, the Court can be side-by-side with the agency. We know the agency is beginning. It starts with light motor vehicles, and then it's moving forward. But you say as long as the EPA hasn't gotten to stationary sources, the Court can be conducting a similar function with one of many differences. If the EPA is setting the standards, they will set — they will do it through notice and comment. Everybody will be able to put in a submission. But the Court substituting for the EPA, how does the Court replicate that notice and comment process? You say the Court substituting for the EPA would be the EPA substituting for the Court. That is the default. The beginning position before there was legislation, before there was an agency, is a common-law remedy. But now there is an agency, and we know that it operates in a certain way through notice and comment rulemaking. And here is the Court, and how does it operate to get to those standards? Well, TVA suggests that there's an inexorable march, that there's a regulatory program underway. But what they point to is an agreement by EPA to begin considering whether to regulate new and existing power plants. That can't be enough. The federal common law exists for the purpose of giving states a remedy for interstate pollution. And if it's displaced when the EPA begins thinking about it, then EPA could think about it for a long time. They've said when they hope to complete this rulemaking, but it is not uncommon for delays to enter into such processes, and it could be a long time before EPA actually arrives at a judgment. A lot can happen to delay or derail the fulfillment of a promise. General, do you think that you have a federal common-law cause of action against anybody in the world? Your briefs talk a lot about how these are the five largest emissions producers. But I saw nothing in your theory to limit it to those five. Is there something that you think limits it to large emissions producers rather than anybody in the world? Yes. I think a limitation to substantial sources, and I'll talk in a minute about what that might mean, comes from the restatement definition, from garden variety state cases about involving nuisance, and also perhaps from the requirements of standing itself. This case asks the court to recognize that the states consume the largest emitters of carbon dioxide. These defendants produce 650 million tons a year, or 10% of U.S. emissions, and individually they produce amounts ranging from 1 to 3.5% of U.S. emissions. There is no other company that comes close, except perhaps for a handful of the next largest powerhouse. You're lumping them all together. Suppose you lump together all the cows in the country. Would that allow you to sue all those farmers? I mean, don't you have to do it defendant by defendant? Court sometimes— Cow by cow, or at least farm by farm? Courts sometimes aggregate joint contributors to pollution, particularly where the remedy that's sought is injunctive relief. If this were a damage action, there would be a different problem of allocating to each individual defendant. But the relief that's sought here is the same injunction. Oh, you can lump everybody together. So you can lump together all the people in the United States who breathe, I suppose. No, I think that breathers are not really—for one thing, they don't even really contribute carbon dioxide, because they absorb as well as they exhale it. For another thing, there's no way— All homes, all homes that emit carbon dioxide in their heating system. No, we're talking— The whole country. And you lump them all together, and you say, you know, that equals 10 percent or whatever. It is not necessary to aggregate to have these five defendants stand apart from everybody else. Well, then don't give us a 10 percent figure. Give us the maximum figure for a single one of them. Three and a half percent of U.S. emissions. Well, why do you stop at U.S. emissions? What percentage of worldwide emissions, every one of which I assume harms your clients, do these five power plants represent? Infinitesimal, right? Not infinitesimal, actually. I believe that U.S. emissions are a quarter of world emissions, so you would divide these numbers by four, approximately. From power plants, or total emissions? Total emissions. And— And anybody who is a substantial contributor could be sued. Yes. And in terms of determining what—who is a substantial contributor, there are—because I do think that at some point a company's emissions or a cow's would be too small to give rise to a standing or—to either standing or a nuisance claim, and there are various ways to draw the lines. But it's a familiar task for common law courts to decide how much is substantial, too. But for an example, if the cutoff were producers of 100,000 tons per year, as in the EPA tailoring rule for new sources, just to take an example, then according to EPA's own technical data, there would be at most a few thousand potential defendants. Do you agree—General Kakyo began his argument in a fairly dramatic fashion by saying we've never in 222 years had a case where the relief—the damages and the relief sought were as broad as they are here. Do you have anything to rebut his proposition? Any case where it has been as broad as it is here? Well, of course, it depends on what you call broad. There are many cases, small cases, involving an attempt to limit discharges by companies What's your best—what's your candidate to rebut his proposition, a broader case with respect to the infliction of damage and the need for relief? Well, I guess what I would say is that cases allowing suits against large contributors, with or without others, and dismissing against small and remote contributors, I give you cases that are cited in our briefs, a California case about a large mine that was sued for polluting a river when lots of others polluted it and were not before the court. Well, not as many as contribute to global warming. No, that's correct. But we could talk about—if we talk about large contributors here, then we're not talking about so many contributors. We could have it down to thousands or hundreds or tens, depending on how we define large. One aspect of the litigation process, as opposed to the agency process, you know, agency makes the rule, and that can be challenged in court. But suppose your plaintiff lost this case on merits. I take it this is not a class action. There's no certification of any class. Other plaintiffs before another district court could launch a similar action against these very same defendants, right? There would be nothing to prove that. No. Well, the patriarchal actions by the states might have some consequence for the citizens of those states. But, yes, there would be others who would have the ability—other states, I suppose. I mean, our claim here is that this Federal common law nuisance is available first and foremost for the states. And the question of whether the land trusts or any other private parties could even bring it is— Well, even if you won and the district court imposed some sort of limit, would there be any obstacle to other plaintiffs bringing suits and another district court issuing a different standard? Well, the—ultimately, such things would be resolved by appeal and by the circuit courts. I mean, there are conflicts in many areas. That's true about every district court litigation. Well, no, it's not. And it's not true of every litigation in this sense, that everyone is harmed by global warming. So unless you limit your suits to the states, which would—I'm not aware of a principled basis for doing that, every individual can bring—every individual in the world, if they can establish jurisdiction, can bring one of these causes of action. Well, a principled basis to limit the—I mean, the Federal common law nuisance, as I said, exists principally for the states. For the reason it survived Erie was the court spoke of the strong Federal interest in providing the states with a remedy for interstate pollution. So there is a principle there. And then beyond the states, plaintiffs would have to—to bring a common law nuisance claim as well as to have standing, would have to have a special injury of some kind that would protect the public. The land trusts here argue that they—because they hold their lands in trust and so forth for the public, they have special standing. That's—there's no need to reach that question. This case could turn and should turn on the right of the states to protect their people from—and their land from interstate— But, General, much of your argument depends on this notion that this suit is really like any other pollution suit. But all those other pollution suits that you've been talking about are much more localized affairs. One factory emitting discharge into one stream. They don't involve these kinds of national, international policy issues of the kind that this case does. I mean, there's a huge gap, a chasm, between the precedents you have in this case, isn't there? I don't know how to call it a chasm, but there's a large distance between them. But I'd like to separate two things. The international aspects of this are simply, I think, beyond—we're not suggesting that this—that the federal common law of nuisance entails relief against international defendants. It does exist for interstate—for conflicts between the states, essentially. So I'd like to put those aside. And then, in terms of the magnitude, well, there are many cases, not just one factory. The Milwaukee v. Illinois itself involved not just the Milwaukee sewage district that was sued, but there were many other contributors to pollution in that lake. In setting these standards, there would be some difficult tradeoffs, wouldn't there? And could you just explain in concrete terms how a district judge would deal with those? Just determining the facts is going to be hard enough. But let's assume all the facts are proven. There's not a dispute about the facts. So that if a certain reduction in greenhouse gas emissions is ordered, that will have this effect. It will increase the cost of electricity by a certain amount, and that will produce certain effects. It will result in the loss of a certain number of jobs. It will mean that consumers will have less money to spend on other things. Some people will not be able to have air conditioning in the summer. That will have health effects. How is a district judge — what standard does a district judge have to decide those? It's just — what is it? Just what's reasonable? Well, reasonableness is the beginning. I've suggested already, first, that we've alleged that this can be done without increasing the cost to the consumers. That may seem — that is a subject for proof. Implausible is the word you're looking for. Thank you, Justice Scalia. But a very good place to look is what other companies have been able to do or have done, including, as I suggested, in Tennessee Copper and perhaps in this area as well, companies that settle this litigation or companies that don't litigate but instead do adopt measures that haven't been widely adopted. There is a practice to examine in the world about what's feasible and what's cost-effective, and that's not different from — Well, suppose cost-effective. Suppose your complaint is the same that you alleged. What I get from reading this might be the best way to deal with the problem. I would like the court to impose a tax of $20 a ton on carbon. And we bring all the polluters in, and the same injury that you have, everything's the same. You have 14 experts who say this is how to get it done. It's cost-effective. It'll lead to substitution. It will actually bring about a world without global warming. And so let's do it. Now, does the district judge, in your opinion, have the power to enter that order? I don't think so. All right. Now, the next question is going to be if he does not have the power to enter that order, which could be proved to be extremely effective and has least possible harm to the consumer, why does he have the power to enter the order you want? Because the common law of nuisance is addressed to direct the polluter to abate the nuisance. Oh, this will. This is addressed to that. It says abate the nuisance. Here's how you're going to do it. You're going to put a $20 a ton tax on carbon, and lo and behold, you will discover that nuisance will be abated. And we bring in 15 economists to show you. Actually, the order we're asking for is less intrusive than that. We ask the defendants to abate the nuisance. We ask the court to order them to abate the nuisance by some amount informed by what information is available about methane. Well, why is it less intrusive? You try to get into the details of how an electricity company will, in fact, run its operation, than to say all you have to do is make a change in the dollar sign that you charge for your product. Well, because we're not suggesting that the court would get into the details on our theory either. It would be the defendants that would get into the details, that would figure out for themselves what the best way was to meet the standard. I wish Justice Breyer had made this argument in the EPA case. I don't think the EPA case. And, of course, it's true that if you conclude that the federal statutes displace the federal and the federal regulations displace the federal common law, either now or in the future, then under Willett, the same federal statute that displaces the federal common law will revive source state common law because of the savings clause in that statute, because of a choice Congress made. And that result, while less respectable of the federal interest in providing federal law to govern these disputes, would nevertheless leave common law courts in the business of attempting to address unaddressed pollution problems. The suggestion has been made that the EPA has entered the field of greenhouse gas, and that's enough. But it isn't just one field. It only seems like one because the EPA once said the whole subject was off limits and beyond their jurisdiction. Once that obstacle is removed, there still remains a series of programs under the statute, a series of kinds of sources that need to be regulated. The Clean Air Act regulates by substance and by source the collection of statutory programs, and taking action under one program can't displace the common law as it applies to matters outside that program. It may well be that there will be a regulation soon that displaces, but it would be very surprising if this Court concluded that the promise of regulation is enough to displace the federal common law, as distinguished from the actuality of it. The Court has suggested that a court might impose standards that would conflict with what the EPA is doing, but there's really no reason to think that would happen, because if what a court sets out to do is find out what feasible methods there are for reduction and then order the defendants to make reductions that are feasible, that's a much less taxing inquiry, a much less demanding inquiry than the EPA is likely ultimately to make. What if the EPA comes up with a different number than the one that you achieve in this litigation? Would the EPA prevail, the EPA's number prevail, or your number prevail? You mean an emission reduction? Yeah, yeah. When the EPA speaks, the EPA's rule will displace the federal common law. We're talking entirely... And will displace the judgment that has been obtained under federal law. It would presumably provide a basis for the defendant to go back to the court and vacate the judgment or alter the judgment to comply with regulation, should that happen. And the Court says no. That's what appellate courts are here for, isn't it? Well, I guess to follow up, what is the appellate court reviewing? Is it reviewing the reasonableness of EPA's judgment or the continuing validity of the injunction it entered previously? The continuing validity of the injunction it issued previously, because once the EPA... So that seems to be a displacement of the normal process of administrative law, which we would review the agency's determination of how best and to what extent to regulate the emissions. On a different litigation track, it would also be possible to challenge the EPA's regulatory judgment. But in the case in which a judgment had already been entered, it is the ordinary litigation track to, if intervening events make equitable relief no longer equitable, to go back to the court and ask the court to modify the injunction. Yeah, and I guess that's the central problem. Once you turn it over to litigation, it's an entirely different set of standards that would regulate emissions as opposed to the standards that would apply with respect to an agency's determination. I don't think it's a different set of... Yes. One set of standards for reviewing an agency's determination, but the ultimate standards that are reached are going to be a level of emission reductions through either process. When the agency speaks to the question, the federal common law is displaced. When it doesn't, and during what could be a long period of time when it doesn't, the states are entitled to a federal law governing their dispute. So we urge this court to keep the federal courts open to states exercising their historic power to protect their land and their citizens from air pollution emitted in other states. Thank you, General Underwood. Mr. Keisler, you have five minutes remaining. Thank you, Mr. Chief Justice. Just a few points. First, with respect to the merits and what it would involve to adjudicate this case, Justice Kagan, it is a task. There's a reason that this issue is so fraught and difficult in international negotiations and at the EPA and in the halls of Congress, and that's because it requires policymakers to allocate burdens among critical social goods in favor of important environmental considerations. And the remedies that are being considered are potentially transformative because they involve the way we use and supply and pay for energy. And the problems with courts attempting to replicate what's going on in those venues are not simply that the matter is complex, although, of course, it's extremely complex, but that there is no legal principle here to guide the decision. It's a question of tradeoffs, how the country wants to balance the projected environmental risks and benefits against the projected economic benefits and costs. If Congress enacts a statute providing a standard, then our political question argument goes away. It's not that this is permanently off-limits to the judiciary. It's that it requires a standard. And in a big, intractable issue like this, Congress can often create an orderly framework for consideration within a statutory context, which it has done in part by enacting the Clean Air Act. And the final point I would make is that my friend and I come at this really from opposite angles in the following sense, which is the plaintiffs say that this is a deeply historically rooted cause of action with a very strong and ancient pedigree, and therefore it can't possibly present justiciability problems, understanding and political question doctrines. And we say that the very powerful standing and political question obstacles that we think are apparent on the face of this are a signal that this is nothing like the historical cause of action that they've relied on. To classify climate change as a tort would trigger a massive shift of institutional authority away from the politically accountable branches and to the courts, which we think would be inconsistent with separation of powers. And for those reasons, we ask that the court reverse the judgment and direct that the case be dismissed. Thank you, Mr. Keisler. Counsel, the case is submitted.